UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

SARUNAS PLETKUS, acting on behalf of minor child, E.P.,

Petitioner,

v. Case No.: 2:26-cv-1209-SPC-NPM

ANA SALETIS,

Respondent.

---

**OPINION AND ORDER**

Before the Court is Petitioner Sarunas Pletkus' Verified Petition for Return of Minor Child to Lithuania, filed on April 16, 2026. (Doc. 1). Respondent Ana Saletis filed an Answer on May 19, 2026. (Doc. 27). The Court held a final evidentiary hearing on the Petition on June 26, 2026. (Doc. 36). The Court heard testimony from Respondent Ana Saletis; Petitioner's witness, Greta Vitaite; Respondent's expert witness, Dr. Christine Borelli Grout; and Petitioner Sarunas Pletkus. The Court also received evidence, including contemporaneous video recordings, translated transcripts of those recordings, psychological records, photographs, and evidence relating to various Lithuanian court proceedings.

Petitioner filed the Petition under the Hague Convention on the Civil Aspects of International Child Abduction ("Hague Convention"), Oct. 25,

1980, T.I.A.S. No. 11,670 1343 U.N.T.S. 97, reprinted in 51 Fed. Reg. 10,493 (Mar. 26, 1986) and the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. § 11601 *et seq*. Petitioner and Respondent are the divorced parents of E.P., their five-year-old daughter. Petitioner alleges that Respondent wrongfully removed the child from Lithuania and has wrongfully retained her in the United States. Respondent alleges that Petitioner sexually abused the child and that returning her to Lithuania would expose her to a grave risk of physical or psychological harm.

Having carefully considered the testimony of each witness, observed the demeanor of those witnesses, reviewed the admitted exhibits, considered the arguments of counsel, and weighed the evidence as a whole, the Court makes the following Findings of Fact and Conclusions of Law under Federal Rule of Civil Procedure Rule 52(a).

## Legal Standard

The purpose of the Hague Convention is "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for rights of access." *See* Convention, pmbl. "The Convention generally intends to restore the pre-abduction status quo and deter parents from crossing borders in search of a more sympathetic court for custody hearings." *See Hanley v. Roy*, 485 F.3d

641, 644 (11th Cir. 2007). As such, "[t]he court's inquiry is limited to the merits of the abduction claim and not the merits of the underlying custody battle." *See Ruiz v. Tenorio*, 392 F.3d 1247, 1250 (11th Cir. 2004). The Hague Convention "applies to children under sixteen years of age who are 'habitually resident' in a contracting state (Convention, Art. 4) and are 'wrongfully removed' to another contracting state (Convention, Art. 1)." *Seaman v. Peterson*, 766 F.3d 1252, 1257 (11th Cir. 2014). A removal is "wrongful" within the meaning of the Hague Convention where:

> a. it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and
>
> b. at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.
>
> The rights of custody mentioned in sub-paragraph a above, may arise in particular by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of that State.

*See* Convention, Art. 3. A petitioner bears the burden of establishing by a preponderance of the evidence that "the child has been wrongfully removed or retained within the meaning of the Convention." *See* 22 U.S.C. § 9003(e)(1)(A). If a petitioner establishes a wrongful removal or retention, then "the authority concerned shall order the return of the child forthwith," unless the respondent establishes one of the affirmative defenses enumerated in the Convention.

*See* Convention, Art. 12; *see also Baran v. Beaty*, 526 F.3d 1340, 1344 (11th Cir. 2008).

To prevail, Petitioner must prove that: (1) the child was "habitually resident" in Lithuania at the time Respondent retained her in the United States; (2) the retention was in breach of Petitioner's custody rights under Lithuanian law, and (3) he had been exercising those rights at the time of retention. *See Ruiz*, 392 F.3d at 1251.

As stated above, the Hague Convention provides certain affirmative defenses to the return of a child. *See Baran*, 526 F.3d at 1344–45. "These affirmative defenses are to be narrowly construed to effectuate the purposes of the Convention and, even if proven, do not automatically preclude an order of return." *Id.* at 1345. Here, Respondent only asserts the grave risk defense, which requires proof by clear and convincing evidence "that return would expose the child to a 'grave risk' of 'physical or psychological harm or otherwise place [the child] in an intolerable situation.'" *Bader v. Kramer*, 484 F.3d 666, 668 (4th Cir. 2007) (alteration in original) (quoting *Miller v. Miller*, 240 F.3d 392, 398 (4th Cir. 2001)).

## Findings of Fact[1]

[1] The Court cites the transcript as (Tr. __), located on the docket at Doc. 37. Regarding exhibits, neither party provided Bates stamps. Therefore, the Court simply cites the exhibit number and page number, if possible.

At the final evidentiary hearing, Respondent stipulated that Petitioner has established each element of a prima facie case under the Hague Convention. (Tr. 4:21–5:14). Specifically, the parties stipulated that: Lithuania was E.P.'s habitual residence immediately before her removal; Petitioner possessed rights of custody under Lithuanian law; Petitioner was exercising those rights at the time of removal; and E.P. had not attained sixteen years. (Tr. 5:1–14). As a result, the Court finds that Petitioner has established a prima facie case. Accordingly, the only disputed issue before the Court is Respondent's affirmative defense under Article 13(b). (Tr. 6:14–22).

Respondent is the biological mother (Tr. 12:1–21) and Petitioner is the biological father of E.P. (Tr. 12:22–23). They married in Lithuania in December 2020 and divorced in October 2023. (Tr. 13:1–2; Pet. Ex. 4 (Lithuanian Parenting Order)). In October 2023, the Vilnius City District Court ruled that E.P would live primarily with Respondent and have visitation—also referred to in the record as communication—with Petitioner. (Pet. Ex. 4). Visitation would increase as E.P. aged. If a parent planned a trip to the United States that would exceed two weeks, the non-traveling parent had to provide written consent. (Pet. Ex. 4 at 3).

As E.P.'s primary caregiver, Respondent was familiar with the child's routine behavior and emotional condition. (Tr. 13:9–13). Petitioner's parenting time generally consisted of Tuesday and Thursday visits,

alternating weekends, and additional weekend parenting time after E.P. turned four. (Tr. 13:14–21).

Several months after the divorce, Respondent observed a change in E.P.'s emotional and behavioral functioning, including increased clinginess, separation anxiety, nightmares, nighttime screaming, bedwetting, biting her lips, resistance to touch, resistance to being undressed, and increasing emotional distress, such as fear, distress, and hysteria upon seeing her father for visitation. (Tr. 14:20–15:14). Respondent testified that E.P. asked her to rub her "just like Daddy does" and pointed toward her genital area. (Tr. 17:2–4; Tr. 17:12–18:1).

Initially, Respondent did not attribute these behavioral changes to sexual abuse or any other specific cause. Respondent questioned whether Petitioner might inadvertently have frightened or injured E.P. and approached him about the child's fear and behavioral regression. (Tr. 15:15–21). Petitioner denied anything unusual had occurred and attributed Respondent's concerns to her imagination. (Tr. 15:20–21).

In addition to behavioral changes, Respondent observed certain physical changes in E.P., such as redness of E.P.'s genital area and continuous discharge, despite ordinary daily hygiene. (Tr. 16:12–17:1). But nothing in the record suggests that Respondent brought E.P. to a doctor to examine her following her observation of these physical symptoms. And no United States

child sexual abuse medical evaluation was ever performed. (Tr. 112:8–10; Resp. Ex. 16 at 7).

Respondent testified that the child became increasingly distressed before parenting exchanges. For instance, the child would hide when Petitioner arrived and repeatedly pleaded with Respondent, "Mom, please don't do it." (Tr. 18:14–20). Further, Respondent testified that E.P. described various games she played with Petitioner. One game involved E.P. and Petitioner removing clothing, entering a closet together, tickling, and then showering before getting dressed. (Tr. 19:4–20:7). During the same conversation, E.P. demonstrated an awareness of Petitioner's anatomy that Respondent found unexpected for a child of her age. (Tr. 20:8–17).

Respondent preserved several of E.P.'s disclosures in contemporaneous video recordings that capture E.P.'s demeanor, affect, manner of speaking, and responses. (Resp. Exs. 2–9). In the March 2024, recording, E.P. described a game played with Petitioner where they tickled each other while naked in a closet. (Tr. 26:1–29:10; 30:22–25; Resp. Exs. 2, 3). In the May 2024, recording, E.P. removed the clothing from a newly purchased doll, stated the doll would remain naked "just like I am at Dad's house," and further stated she did not like the game. (Tr. 20:18–25:11; Resp. Exs. 4, 5). In the June 2024 recording, E.P. began licking Respondent. When Respondent asked her to stop, E.P. said it is a game she played with her father where they licked each other. (Tr. 31:3–

32:8; Resp. Exs. 6, 7). Finally, in the July 2024 recording, Respondent observed E.P. pushing a toy into her genital area while they were in the car. When Respondent inquired why E.P. was doing so, E.P. replied, “It is nice. Dad says it is nice.” E.P. explained both she and her father do it. (Tr. 29:12–30:10; 32:10–35:2; Resp. Exs. 8, 9).

Respondent did not immediately report Petitioner’s alleged conduct to law enforcement or remove E.P. from all contact with him. Instead, Respondent first spoke directly with Petitioner concerning E.P.’s disclosures. Respondent advised Petitioner she wished to determine the source of E.P.’s statements before involving governmental authorities. (Tr. 35:12–36:3). Respondent proposed Petitioner’s parenting time continue under supervised conditions or in the presence of both parents until professionals could determine why E.P. was acting this way. (Tr. 36:4–16). Petitioner initially expressed agreement that the matter should be investigated and indicated a willingness to cooperate. (Tr. 36:15–37:13).

As a result of these events, Respondent sought assistance from various entities. In March 2024, she contacted the Uzuoveja Care Home, Children Support Centre for Victims of Sexual Abuse (“Care Home”), an agency that provides support to sexually abused children. Inga Jonaitiene, a psychologist with the Care Home, interviewed E.P.

Following the interview, the Care Home issued an assessment report on July 5, 2024, to the District Court of Vilnius City, explaining it could neither confirm nor exclude that E.P. had been sexually abused. (Resp. Ex. 1). The psychologist stated that "[n]o sexualized or unusual behavior on the part of the girl was observed at the Support Centre." (Resp. Ex. 1). Further, "no specific situations emerged that would allow for an assumption of experienced sexual abuse." (Resp. Ex. 1). The psychologist did note, however, that E.P. had trouble differentiating between appropriate and inappropriate touch, so she may not perceive such touch as inappropriate. The Care Home provided recommendations for assistance to E.P. (Tr. 48:25–51:23; Resp. Ex. 1).

On July 26, 2024, Respondent applied to In Pace Vilnius Archdiocese Caritas Mediation Center ("In Pace") regarding mediation services aimed at ensuring the child-needs-based communication between Petitioner and E.P. procedure. (Pet. Ex. 6 (Opinion on Implementation of Further Communication With Child)). In Pace provided this service without a court order and with Respondent and Petitioner's consent, meeting with the parties numerous times, including: three meetings with Petitioner, three meetings with Respondent, two meetings with both parties, and two meetings with Petitioner and E.P.

After these meetings, In Pace's specialists issued an opinion explaining why visitation with E.P. was not being implemented smoothly. The specialists

noted that both parents were highly committed to the child's upbringing and endeavored to actively participate in her life. However, Respondent's "anxiety and fears, the unresolved relationship issues between both parents, and the existing court situation concerning the claims against the father have a significant impact on the smoothness of the father's communication with [E.P.]." (Pet. Ex. 6 at 2).

Further, the specialists made several observations about Respondent. For instance, Respondent "interprets certain information contrary to the actual situation." (Pet. Ex. 6 at 2). In their view, Respondent was convinced her parenting methods are correct, so she was inclined to disagree with Petitioner's parenting methods. Further, Respondent had difficulty understanding what information should be provided to a child of E.P.'s age and how it should be presented. Later, they opined that Respondent could respond to the child's needs, tried to care for her emotional and psychological well-being, but, "due to her own emotional and psychological state, she experiences difficulties when bringing the child to the father." (Pet. Ex. 6 at 2). The specialists observed that Respondent "experiences significant anxiety, finds it difficult to regulate her emotions, and wants to say goodbye to her daughter several times, even though there is no real basis for this," and such behavior confused E.P. (Pet. Ex. 6 at 2).

Further, E.P.'s behavior noticeably changed when Respondent returned to retrieve her from visiting with Petitioner. For example, the child became more irritable, anxious, and asked Respondent to pick her up, whereas before she was relaxed and playing with her father. "Such observations allow [the specialists] to assume that the mother's anxiety and psychological state affect the daughter's emotional state and behavior." (Pet. Ex. 6 at 3).

Additionally, the specialists made several observations about Petitioner and his meetings with E.P. They stated that their bond was close, with Petitioner able to respond to the child's physiological and emotional needs. Further, E.P. was relaxed with Petitioner, got involved in games, willingly socialized, and was sad when it was time to separate. They opined that Petitioner had the necessary parenting skills to independently care for E.P. Additionally, they recommended that Respondent apply for help to the specialists due to her psychological and emotional state.

Respondent also filed official complaints against Petitioner. In July 2024, she filed a complaint with the Vilnius Regional Prosecutor's Office and requested a criminal prosecution of Petitioner and protection from sexual violence for E.P. (Tr. 53:17–55:7; Resp. Ex. 10, 11). In September 2024, Respondent filed a request with the Vilnius Regional Prosecutor's Office for a forensic psychological evaluation of E.P. The examination neither confirmed nor excluded that Petitioner sexually abused E.P. (Tr. 55:8–57:5; Resp. Ex.

12). On July 15 or 16, 2025, the Prosecutor's Office terminated the pretrial investigation. (Pet. Ex. 9 at 1).

Respondent appealed the decision to terminate the pretrial investigation several times. (Pet. Ex. 9 at 1). The Higher Prosecutor dismissed Respondent's first appeal on August 20, 2025. Then, the Pre-Trial Investigation Judge of the Vilnius City District Court dismissed Respondent's appeal of the Higher Prosecutor's decision on October 29, 2025. Undeterred, Respondent appealed yet again, this time to the Vilnius Regional Court.

On November 25, 2025, the Vilnius Regional Court dismissed Respondent's appeal.[2] (Pet. Ex. 9 at 6). In so holding, the Court noted that the existence of Petitioner's criminal acts was based on the explanations of Respondent, but other than her explanations, no objective data obtained during the pretrial investigation confirmed the criminal acts. As the court recounted, the investigation was conducted comprehensively, and "the fact that [Respondent] does not agree with the conclusions drawn does not in itself constitute grounds to annul the procedural decisions adopted by the prosecutors." (Pet. Ex. 9 at 5). In describing Respondent's appeal, the court noted that it "should be taken into account that the [investigation conducted by the Child and Adolescent Court Psychiatry Department of the National

[2] That ruling was not subject to appeal. (Pet. Ex. 9 at 6).

Forensic Psychiatry Service under the Ministry of Health] was conducted when more than a year passed after the period subject to the investigation, and, as the investigation concerned a minor child, it is likely that the victim may not have been able to describe circumstances precisely." (Pet. Ex. 9 at 2).

Among other things, the court observed that any circumstances that Respondent's close family members described should "be assessed extremely critically" and that their testimony would be insufficient to confirm or deny that Petitioner committed the criminal acts against the child. (Pet. Ex. 9 at 3). The court also stated that, viewing the totality of the data obtained during the pretrial investigation and the conflicting relations that developed between Petitioner and Respondent, "it can be seen that [Respondent] tends in a way to resolve the family conflict with the help of criminal law." (Pet. Ex. 9 at 5).

During this time, Respondent was not the only parent to seek relief from the Lithuanian judicial system. At some point, Petitioner applied to the Vilnius City District Court to issue a writ of execution because Respondent failed to comply with the divorce decree's visitation provisions. (Pet. Ex. 7 (Lithuanian Order Regarding Communication)). On November 4, 2024, the Vilnius City District Court ruled in Petitioner's favor. Among other things, the court observed that Respondent tried to eliminate Petitioner from E.P.'s life by "making unfounded accusations against [him] which have the characteristics of a criminal act[.]" (Pet. Ex. 7 at 1). Further, the visitation did not comply

with required procedures and "raise[d] concerns regarding the behavior of the mother of the child herself, which, possibly, does not correspond to the general principles of ethics and the interests of the child." (Pet. Ex. 7 at 1). As the court found, the Petitioner made maximum efforts to have the investigation related to abuse allegations conducted as objectively as possible and that E.P. communicated freely with Petitioner even after a period of time without seeing him. Ultimately, the court enforced Petitioner's visitation with E.P.

Respondent appealed the order enforcing visitation. On October 2, 2025, the Klaipeda Regional Court affirmed the ruling and awarded Petitioner his litigation expenses. (Pet. Ex. 8 (Lithuanian Appeal Regarding Communication)).

A few months earlier, on June 27, 2025, Respondent brought E.P. to the United States for a family visit that was to last two weeks under the divorce order. (Tr. 60:3–18). Respondent subsequently decided to remain in the United States with E.P. because "we were just having such a great time here with my family, and [E.P.] was so happy to see them." (Tr. 60:25–61:1). According to Respondent, she notified Petitioner of these plans and the changes.

Respondent also provided a personal medical reason for staying in the United States. She sustained a back injury in boot camp while serving in the United States Navy and is currently undergoing treatment. (Tr. 61:8–62:13;

70:8–25). On July 29, 2025, the Minneapolis Veterans Affairs Health Care System issued Respondent a work limitation: no commercial airline travel until cleared by a doctor. (Resp. Ex. 15). Respondent obtained this limitation only two weeks after the decision to terminate the Lithuanian pretrial investigation and a month after bringing E.P. to the United States.

On April 16, 2026, Petitioner filed this action seeking E.P.'s return. (Doc. 1). Thereafter, Respondent sought the assistance of Dr. Christine Borelli, a licensed psychologist experienced in evaluating young children. Dr. Borelli prepared a written psychological evaluation of the child and testified at the evidentiary hearing. (Resp. Ex. 16).

During Dr. Borelli's evaluation, E.P. displayed distress, avoidance, and dysregulation when the discussion turned to Petitioner. (Tr. 99:17–101:8). This pattern suggested trauma associated with a particular individual or environment, rather than generalized childhood anxiety. (Tr. 101:16–103:4). Dr. Borelli further testified that she never completed a full interview of the child, never interviewed Petitioner, nor did she reach any specific diagnosis for E.P. (Tr. 101:9–12, 107:1–7, 111:1–9). Dr. Borelli acknowledged young children may be suggestible and that she could not independently verify every historical allegation. And she noted in her report that a United States child sexual abuse medical evaluation report was not provided, and the absence of

such a report limits medical/forensic conclusions regarding physical findings, differential diagnosis, and health needs. (Resp. Ex. 16 at 7).

Dr. Borelli ultimately concluded, to a reasonable degree of psychological certainty, that compelling E.P.'s return under the circumstances presented would expose her to a grave risk of psychological harm or would otherwise place her in an intolerable situation. (Tr. 101:16–103:20). Significantly, Dr. Borelli explained her opinion did not depend on a definitive determination that sexual abuse had occurred. (Tr. 112:14–22). Like the other evidence in the record, Dr. Borelli reported that the "records do not establish a definitive criminal or medical finding that abuse occurred, and they do not definitively exclude it." (Resp. Ex. 16 at 11). Rather, her opinion rested upon E.P.'s present psychological condition, the trauma-related symptoms she personally observed, the consistency of the child's emotional responses, and the foreseeable psychological consequences of compelling her return to the environment associated with those trauma responses. (Tr. 101:16–103:20).

The Court also heard testimony from Greta Vitaite, a Lithuanian social worker who observed interactions between Petitioner and E.P. over approximately one and one-half years. (Tr. 39:1–42:25). Vitaite observed Petitioner interacting appropriately toward E.P., and she did not personally observe conduct she interpreted as abusive. (Tr. 40:14-42:8). But Vitaite did not reside with the parties; observed only selected parenting visits and was not

present for every parenting exchange; and did not perform psychological testing, a trauma assessment, or a forensic interview.

Finally, Petitioner testified remotely. He stated that he has never sexually abused E.P. or done anything sexually inappropriate. (Tr. 119:24–120:1). He denied playing games with E.P. where she was naked and he touched her private parts, or a game where he inserted anything into her vagina or other body parts. (Tr. 120:2–9). Further, he introduced photographs and videos depicting affectionate interactions between himself and E.P. (Pet. Exs. 4, 6, 7, 8, 9, 19, 20). These videos were taken around May or June 2025, only a few weeks before Respondent brought E.P. to the United States in late June 2025. (Tr. 133:17–21). E.P. appeared comfortable, engaged, and affectionate toward Petitioner.

**Conclusions of Law**

Having listened to the testimony, observed the witnesses' demeanors, and considered corroborating evidence, for the below reasons, the Court concludes Respondent has not carried her burden of establishing E.P. faces a grave risk of harm or an intolerable situation if returned to Lithuania. Additionally, the Court finds Respondent has not shown by clear and convincing evidence that Petitioner abused their daughter. *See Abrego v. Garfias*, No. 1:24-CV-2272-MLB, 2024 WL 6956468, at *4 (N.D. Ga. Dec. 30,

2024) (finding respondent failed to carry her burden to show that petitioner abused the children in any way).

Consistent with the Hague Convention's central aim of protecting children, the Convention also provides an exception to mandatory repatriation where "there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Hague Convention art. 13(b). Two kinds of situations present "grave risk" to a child: "returning the child to a zone of war, famine, or disease," and evidence of "serious abuse or neglect, or extraordinary emotional dependence."[3] *Baran*, 526 F.3d at 1347 (quoting *Friedrich v. Friedrich*, 78 F.3d 1060, 1069 (6th Cir. 1996)); *see also Fernandez v. Somaru*, No. 2:12–CV–262–FTM–29, 2012 WL 3553779, at *11 (M.D. Fla. Aug. 17, 2012). The Eleventh Circuit has stressed that "only evidence *directly establishing* the existence of a grave risk that would expose the child to physical or emotional harm or otherwise place the child in an intolerable situation is material to the court's determination." *Gomez*, 812 F.3d at 1012 (emphasis added) (quoting Hague Convention Analysis 10510); *De La Riva v. Soto*, 183 F. Supp. 3d 1182, 1198–99 (M.D. Fla. 2016). "If proven, sexual abuse of a child is clearly an intolerable

[3] "In this Circuit, the district court is not required to also find that the home country is unable to protect the child from that grave risk of harm." *Gomez v. Fuenmayor*, 812 F.3d 1005, 1012 (11th Cir. 2016) (citations omitted).

situation excusing return of the child to her habitual residence." *Higuera v. Jimenez*, No. 1:23-CV-05026-LMM, 2023 WL 12156566, at *6 (N.D. Ga. Nov. 15, 2023) (citing *Baran*, 562 F.3d at 1348).

"The assessment focuses upon the child, and it does not matter if the respondent is the better parent in the long run." *In re S.L.C.*, 4 F. Supp. 3d 1338, 1350 (M.D. Fla. 2014) (citing *Nunez–Escudero v. Tice–Menley*, 58 F.3d 374, 377 (8th Cir. 1995)). "The exception for grave harm to the child is not license for a court in the abducted-to country to speculate on where the child would be happiest." *Id.* (citing *Friedrich,* 78 F.3d at 1068). "A removing parent must not be allowed to abduct a child and then—when brought to court—complain that the child has grown used to the surroundings to which they were abducted." *Friedrich,* 78 F.3d at 1068.

This exception requires the alleged physical or psychological harm be "a great deal more than minimal." *Whallon v. Lynn*, 230 F.3d 450, 459 (1st Cir. 2000) (quoting *Walsh v. Walsh,* 221 F.3d 204, 218 (1st Cir. 2000)). Only severe potential harm to the child will trigger this Article 13(b) exception. *Nunez–Escudero,* 58 F.3d at 377 (citing the Supreme Court of Canada in *Thomson v. Thomson,* 119 D.L.R. 4th 253, 286 (Can. 1994)). The harm must be greater than what is normally expected when taking a child away from one parent and passing the child to another parent. *Whallon,* 230 F.3d at 459.

For the following reasons, the Court concludes that Respondent has failed to meet her burden of showing by clear and convincing evidence that the child will suffer a grave risk of physical or psychological harm or otherwise experience an intolerable situation if returned to Lithuania. Several factors underpin the Court's conclusion. In large part, the Court relies on the absence of clear and convincing evidence that Petitioner sexually abused the child.[4] In this, the Court is not alone. The evidence in the record, most of which was obtained before Respondent brought the child to the United States, demonstrates that Lithuanian courts, social workers, and psychologists have been unable to determine whether Petitioner sexually abused E.P. And the meager evidence in the record collected since Respondent and E.P. arrived in the United States does not show otherwise.

With respect to the evidence from Lithuanian courts, In Pace, the psychological evaluation, and other similar evidence, the Court accords it great weight. It is the most unbiased and objective evidence in the record. Equally important, such evidence is the closest in time to the events in question. That no Lithuanian criminal or civil authority that investigated the allegations of

[4] The Court realizes that in the Eleventh Circuit, "[t]he requisite finding for the exception to apply is not that the child has previously been harmed, but rather that return would expose him to a present grave risk of physical or psychological harm, or otherwise place him in an intolerable situation." *Gomez*, 812 F.3d at 1013. In this case, the determination of grave risk of harm upon return is inextricably intertwined with whether Petitioner previously sexually abused the child.

sexual abuse could determine whether such conduct occurred is highly persuasive.

As is the testimony of Greta Vitaite, a Lithuanian social worker in the family aid department. Vitaite observed Petitioner with E.P. over an extended period of time—approximately every two weeks, from early 2024 through mid-2025. (Tr. 40:3–13). She described their "very strong and close bond," where Petitioner "was definitely able to satisfy all the . . . emotional and basic needs" of the child. (Tr. 40:17–22). Importantly, she never witnessed E.P. being afraid of Petitioner. Rather, she described E.P. as happy and always relaxed. Further, she never noticed any conduct that would cause her to report Petitioner to the police. The Court finds Ms. Vitaite's testimony credible and unbiased. Accordingly, the Court gives her testimony great weight.

Next, the Court addresses Respondent's testimony. While the Court finds that Respondent believes Petitioner sexually abused E.P., several of Respondent's key decisions and actions significantly undermine her credibility. For these reasons, the Court affords Respondent's testimony only slight to some weight. Critically, Respondent never took E.P. to a doctor for a physical examination upon discovering physical symptoms of alleged sexual abuse. This fact undermines Respondent's credibility, as does the fact that upon suspecting sexual abuse, she did not immediately remove the child from all contact with Petitioner or report the alleged conduct to law enforcement.

Instead, Respondent spoke with Petitioner about E.P.'s disclosures. In the Court's view, this course of conduct is inconsistent with a sincere belief of sexual abuse. *See Abrego*, 2024 WL 6956468, at *7 ("The Court also considers significant evidence that Respondent permitted her son to stay overnight and/or unsupervised with Petitioner after she allegedly learned of the abuse—conduct totally inconsistent with her claim of abuse.").

Additionally, Respondent's statements surrounding traveling to the United States with the child ring false. She claims to have brought the child here for a two-week vacation. Yet she brought her daughter's cat with them, indicating a longer—if not indefinite—stay. (Tr. 79:13–23). Additionally, Respondent apparently had no physical or medical issues flying *to* the United States. But a mere two weeks after the Lithuanian prosecutor terminated the pretrial investigation into the abuse allegations, Respondent obtained a doctor's note from the Minneapolis VA with a work limitation prohibiting commercial airline travel until cleared by a doctor. The record contains no evidence that Respondent attempted to return E.P. to Lithuania by other means, such as asking a family member or Petitioner himself to bring her home.

Respondent presented videos of E.P. to support the existence of grave risk, which the Court viewed. In the videos, E.P. describes incidents of abuse by Petitioner. In the Court's view, these videos, while disturbing, do not

establish that Petitioner sexually abused the child. Numerous authorities have explained, and the Court agrees, that when the videos were created—and even now—E.P. was at a highly suggestible, influential age. Even Dr. Borelli describes these circumstances as a limitation of her report, specifically: E.P. is five years old, and "statements made by a child of this age must be interpreted in light of developmental level, language ability, suggestibility, memory limitations, dependence on caregivers, loyalty conflict, and exposure to adult conflict." (Resp. Ex. 16 at 7). In analyzing the Lithuanian psychological records, Dr. Borelli wrote that they "are most appropriately interpreted as showing a developmentally young child whose allegations and fear require careful clinical attention, but whose age, suggestibility, and limited testimonial capacity substantially restrict the certainty of conclusions drawn from child statements alone." (Resp. Ex. 16 at 8).

The videos were apparently created solely in Respondent's presence and Respondent's prompting. The Vilnius Regional Court noted that the video recordings[5] Respondent submitted were "assessed as unreliable data in the pre-trial investigation." (Pet. Ex. 9 at 4). In dismissing Respondent's appeal,

[5] While it is unclear whether the Vilnius Regional Court viewed the identical videos as this Court, its analysis of the nature of the videos and Respondent's role in them is highly relevant and persuasive.

the Vilnius Regional Court noted Respondent's influence and partiality regarding the video evidence, stating that

> based on the videos submitted by the appellant, it is not possible to draw a concrete conclusion regarding the environment surrounding the child and the factors present therein at the time of making the videos, as well as that the obvious influence exerted by A. Saletis herself on the minor daughter, which has been repeatedly stated, should be taken into account. The partiality of the videos is also proven in part by the report of 12 -13 June 2025 regarding the examination of other objects, by which video recordings provided by S. Pletkus were examined, and which substantiates the fact that, contrary to what is stated in the appeal to the court of higher instance, A. Saletis is hostile to S. Pletkus, while no actual allegedly inadequate behaviour of the father with the minor child was established.

(Pet. Ex. 9 at 5).

Respondent's videos of E.P. are ultimately inconclusive as to whether sexual abuse occurred. *See De Lucia v. Marina Castillo*, No. 3:19-CV-7 (CDL), 2019 WL 1905158, at *9 (M.D. Ga. Apr. 29, 2019) (finding respondent did not present evidence that petition sexually abused either of the children and noting that "although it is disturbing that a child would engage in exhibitionist gestures during a bath and attribute them to a "game of the father," the Court does not find that this evidence establishes by clear and convincing evidence a grave risk of harm to the Children"). Under these circumstances, the Court affords this evidence little weight.

At the final evidentiary hearing, the Court also heard Petitioner's testimony and viewed a video (several minutes long) of him interacting with E.P. (Pet. Exs. 19, 20). The Court affords Petitioner's testimony only some weight in light of his clear bias under the circumstances. At the same time, the Court finds the video of Petitioner and E.P. highly informative and corroborates the record evidence of their close bond. It portrays E.P.'s happy, relaxed demeanor in Petitioner's presence. Most notable is the video's timing. It was taken shortly before E.P.'s removal and undermines other evidence in the record that E.P. was anxious and afraid when she went to visitation with Petitioner. The video depicts a strong relationship between father and daughter, with E.P. showing no fear of her father, of touching him, or of being touched by him. In short, the video shows no indication of abuse or other psychological harm. It depicts a healthy father/daughter relationship.

Finally, there is Dr. Borelli's evidence. Dr. Borelli concludes that E.P. will suffer a grave risk of psychological harm if returned to Lithuania. In her report, she opines that "E.P. demonstrates genuine fear and anxiety concerning contact with her father and return to Lithuania." (Resp. Ex. 16 at 11). Her opinion is based on the records reviewed, the history provided, repeated reports of distress surrounding father contact, and the evaluator's direct observation that E.P. became visibly, significantly distressed and avoidant when benign questions about her father were introduced, requiring

termination of that portion of the interview to avoid further distress. (Resp. Ex. 16 at 11). While Dr. Borelli's testimony and report are the strongest evidence of grave risk in the record, for the reasons below, the Court only affords this evidence some weight.

Of critical importance is that—like every other authority in the record who addressed the allegations of abuse—Dr. Borelli could neither confirm nor deny that Petitioner sexually abused E.P. She wrote in her report that the allegation of possible sexual abuse remains clinically and forensically significant, but the records do not establish a definitive criminal or medical finding that abuse occurred, and they do not definitively exclude it. Significantly, Dr. Borelli emphasized that E.P. has been questioned repeatedly investigative and court-related proceedings concerning the sexual abuse allegations. Questioning such a young child, she opines, can increase stress and anxiety and may reduce the reliability of later statements.

Other aspects of Dr. Borelli's analysis undermine her opinion. Dr. Borelli testified that she has no independent psychological data showing that Petitioner is dangerous to the child. (Tr. 107:23–25). She did not interview relatives or other witnesses Respondent said could corroborate her account. (Tr. 108: 15–17). Dr. Borelli agreed that caregiver influence could not be categorically excluded and that E.P. has been living exclusively with Respondent for approximately one year. (Tr. 11016–21). And she concedes

that the abuse allegations originate with Respondent and her legal filings. (Tr. 108:1–3).

That Dr. Borelli never completed the interview with the child significantly weakens her opinions. Without such an interview, Dr. Borelli's opinions about the grave risk of psychological harm rest primarily on Respondent's allegations and the historical record, which the Court has also had the opportunity to review. And, as discussed extensively above, the record is inconclusive concerning sexual abuse, such that the Lithuanian courts found it appropriate to leave the custody arrangement in place and permit Petitioner to have contact with E.P. As Petitioner points out, the Lithuanian forensic examination found the child highly vulnerable to manipulation and that she tends to repeat expressions and mirrors emotional stress; the Care Home observed no sexual or unusual behavior and found no situation permitting an assumption of experienced abuse; and the state forensic psychiatry service comprehensive examination found no mental disorder, no increased tendency to fantasize, or any non-sexualized vocabulary. (Doc. 41 at 13).

The Court affords no weight to the portion of Dr. Borelli's opinion concerning Respondent's history as a U.S. citizen, U.S.-educated parent, and U.S. Navy veteran, and that she is no longer a Lithuanian citizen and may have less practical authority or access in Lithuania. Respondent chose to remove the child from Lithuania. While the Court has no knowledge of the

circumstances surrounding Respondent's citizenship status, the record reflects that at least until the moment she left Lithuania, Respondent actively litigated the family situation in multiple Lithuanian courts and prevailed upon numerous other services for assistance. She had the resources to do so in Lithuania and continues to do so now in the United States.

Moreover, "[a] removing parent must not be allowed to abduct a child and then-when brought to court-complain that the child has grown used to the surroundings to which they were abducted." *Friedrich*, 78 F.3d at 1068. To that end, the Court gives no weight to Dr. Borelli's opinions concerning E.P.'s adjustment and protective factors in the United States including school participation and peer relationships, among others. (Resp. Ex. 16 at 10).

The Court is deeply concerned by the allegations in this case and the fact that Dr. Borelli opines that E.P. would likely suffer significant psychological deterioration, emotional distress, anxiety symptoms, and retraumatization if returned to Lithuania. (Resp. Ex. 16 at 12). But viewing the evidence in the record, even Dr. Borelli's opinion cannot suffice to meet Respondent's burden to show that E.P. is at grave risk of psychological harm if returned. It is simply not borne out by the overwhelming weight of the evidence in the record that no authority can conclude that Petitioner abused E.P.; that many authorities have noted Respondent's high degree of influence over the child; the child's suggestible age; and Respondent's lack of credibility.

Certainly, sexual abuse by a parent, if proved, would be an intolerable situation that poses a grave risk of psychological harm. *See De Lucia*, 2019 WL 1905158, at *9 (finding respondent failed to meet burden on grave risk defense where she failed to present evidence that petitioner sexually abused the children). But here, Respondent did not present clear and convincing evidence that Petitioner sexually abused E.P. *See Galaviz v. Reyes*, 95 F.4th 246, 262 (5th Cir. 2024) (describing "rigor of the clear and convincing standard in the sexual abuse context" and holding district court erred in finding grave risk of harm where "only evidence of sexual abuse [was] the [respondent's] testimony that he suspected sexual abuse"); *Lopez v. Alcala*, 547 F. Supp. 2d 1255, 1261 (M.D. Fla. 2008) (finding respondent did not establish grave risk of harm where only evidence of child's alleged abuse was from respondent's testimony, which was contradicted by other testimony). The Court also observes—and the extensive Lithuanian judicial and social services records support—that Lithuania is capable of protecting the child if she is subjected to serious threats of harm. *See De Lucia*, 2019 WL 1905158, at *9.

In sum, Respondent failed to present clear and convincing evidence of sexual abuse. There is no evidence that the Lithuanian courts are unable or unwilling to take action, if necessary, to protect the child. Rather, the evidence presented at the final evidentiary hearing establishes that the parties have already availed themselves of the courts to implement and enforce their

custody arrangement, and numerous Lithuanian courts and social services authorities have addressed the allegations of abuse and found they did not warrant action against Petitioner. The Court is satisfied that the Lithuanian courts can take appropriate actions to protect E.P. The Court thus concludes that Respondent did not prove by clear and convincing evidence that the grave risk of harm exception to return applies here.

Accordingly, it is now

**ORDERED:**

1. Petitioner Sarunas Pletkus' Verified Petition for Return of Minor Child to Lithuania (Doc. 1) is **GRANTED**.
2. Petitioner's ore tenus motion for judgment as a matter of law is **DENIED as moot**.
3. **On or before August 17, 2026**, Respondent shall surrender custody of the minor child, E.P., to Petitioner or Petitioner's designee for return to Lithuania. Counsel for Petitioner shall coordinate arrangements with Respondent or Respondent's counsel.
4. Petitioner's counsel shall immediately notify the Court when the child's return to Lithuania is complete.

5. The Clerk is **DIRECTED** to enter judgment accordingly, deny all pending motions as moot, terminate any deadlines, and close the case.

**DONE** and **ORDERED** in Fort Myers, Florida on August 7, 2026.

SHERI POLSTER CHAPPELL
UNITED STATES DISTRICT JUDGE

Copies: All Parties of Record